**UNITED STATES of America ex rel. Edward A. BURT, Petitioner,**

v.

**Howard D. YEAGER, Principal Keeper, New Jersey State Prison at Trenton, Respondent.**

**Civ. No. 377-72.**

United States District Court,
D. New Jersey.

May 9, 1972.

Arthur Penn, First Asst. Deputy Public Defender, Newark, N. J., for petitioner.

Jerome Jay Cohen, Asst. Prosecutor, Camden County, Camden, N. J., for respondent.

OPINION AND ORDER

KITCHEN, District Judge:

Petitioner, Edward A. Burt, seeks the issuance of a writ of habeas corpus pursuant to 28 U.S.C. § 2241. He is presently incarcerated in the New Jersey State Prison, Trenton, New Jersey. Petitioner was tried by a jury in the Camden County Court Law Division. On July 16, 1967, the jury returned a verdict of guilty of murder in the second degree. Indictment No. 685-65. On

July 28, 1967, the Hon. William A. Pascoe sentenced petitioner to a term in the State Prison of not less than twenty-five (25) years, nor more than thirty (30) years. This judgment was appealed to the Superior Court of New Jersey, Appellate Division, where the judgment was affirmed. (State v. Burt) 107 N.J. Super. 390, 258 A.2d 711 (1969). Certification was granted by the New Jersey Supreme Court. 55 N.J. 588, 264 A.2d 63 (1970). The judgment was affirmed for the reasons expressed in the Appellate Division opinion. 59 N.J. 156, 279 A.2d 850 (1971). The United States Supreme Court denied certiorari on January 17, 1972. 404 U.S. 1047, 92 S.Ct. 728, 30 L.Ed.2d 735 (1972). Petitioner has exhausted his state remedies pursuant to 28 U.S.C. § 2254.

Independent review in compliance with Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963) has been made of the pleadings, briefs and trial record. No evidentiary hearing is required.

Petitioner contends that the conviction and sentence pursuant to which he is being detained were imposed "in violation of the Fifth Amendment Guarantee Against Compulsory Self-Incrimination as made applicable to the states by the Fourteenth Amendment." Specifically, petitioner alleges two such violations:

(1) Various trial episodes occurred during cross examination of petitioner which impeached his credibility by reference to the fact that he failed to volunteer exculpatory information to the police while in custody. The effect of this cross examination was, in substance, to penalize petitioner for relying on his right to remain silent while in police custody.

(2) During the summation the prosecutor referred to the fact that defendant failed to tell the police the same exculpatory version he testified to at trial. This amounted to a comment on petitioner's silence, thus penalizing him for that silence.

To place these contentions in the proper perspective it is necessary to provide a backdrop of the trial proofs. In his opinion, concurring in part and dissenting in part, Justice Hall of the New Jersey Supreme Court provided the necessary statement of facts and this court adopts that statement as follows:[1]

"The state sought a first degree murder conviction, with the death penalty, based on a killing in the course of attempted robbery of the victim or on a wilful, deliberate and premeditated shooting. The whole trial was death penalty oriented. In my view, there was no direct evidence or permissible inference sufficient to take either prong of the theory to the jury. At any rate, the jury, by returning a second degree verdict, did not accept either thesis. At the same time, it also rejected defendant's theory of death resulting from an accidental discharge of the gun in the hands of the victim while defendant was trying to wrestle it from him. There were no eye-witnesses to the event. The state's direct evidence had to rest almost exclusively upon the testimony of a Mrs. Everline Adams, principally concerning what defendant told her immediately after the shooting.

"Mrs. Adams (age 61) was a longtime 'intimate' friend of the decedent (age 52). She lived in Philadelphia and was in the habit of visiting him periodically at his home in Camden. She testified that on the day in question she arrived at the home about 6:00 P.M. and found him and defendant (age 32) sitting at the dining room table drinking and talking. She had not previously known defendant and was not introduced to him by name.

"How defendant came to be there was not explained until he testified. He was a friend of Shorty's of long standing, particularly when both lived in Glassboro. He now lived with his wife and children in Philadelphia and had not seen Shorty for six months. On this day he had taken a bus to Glassboro to see his brother, who was working and

1. Footnote citations and comments are omitted.

not at home. He then stole a car from a parking lot in that town and drove to Gloucester City to his brother's place of employment. Unable to see his brother there, he drove to Camden and visited his union headquarters and the unemployment office, apparently to see about work. (He had been employed for some time at Trio Tire Company, a tire retreading establishment in Clementon, when work was available; at the moment none was and he had a temporary job in Philadelphia.) While walking on the street after visiting these offices, he met Shorty, who invited him to his house for a drink. Defendant did not know where Shorty lived. They walked to the house, arrived about 4:00 P.M. and proceeded to talk and drink until Mrs. Adams arrived. Just before she did, defendant said Shorty showed him a revolver, which, with bullets, was in a paper bag. Shorty then put the bag with the gun in his pants pocket. (This was established to be the gun that caused death; the state presented no evidence to account for its origin or presence at the scene or to connect defendant with it prior to the fatal event.)

"To return to Mrs. Adams, she testified that after her arrival, drinking, talking and record playing continued for another hour, with everyone in a friendly mood. It seems evident that by that time both men had consumed considerable whiskey and beer. Shorty then stated that he had had enough to drink, had some business to attend to and wanted to go visit some relatives. Mrs. Adams, who was to accompany him, went upstairs to change her shoes. She said that as soon as she reached the bedroom, she heard a scuffle, a groan and a shot from a gun downstairs. A second shot followed and the sound of someone falling to the floor. Defendant immediately came up the stairs with a gun in his hand, said Shorty was dead, that he was going to kill her and 'blow your brains out just like I blowed his out.' He demanded money and took $5, all she had. He then commanded her to undress and raped her. Thereafter he told her to

dress and that he was not going to kill her. She said he required her to accompany him, at gunpoint, out of the house and to the car parked some distance away. He drove her to the bus station to return to Philadelphia. On the way he had her write his telephone number on a card taken from the car's glove compartment (which she later turned over to the police).

"Defendant's story of the shooting was quite different. He said that after Mrs. Adams arrived, Shorty became unfriendly and acrimonious conversation developed. While the testimony is not too articulate, the impression is gained that defendant thought Shorty was suggesting he was flirting with Mrs. Adams. His story was that, as soon as Mrs. Adams went upstairs, he told Shorty he was going to leave, that Shorty told him to sit down and that when he looked up, Shorty was pointing the revolver at him. He jumped up, grabbed Shorty's arms and tried to wrestle the gun from him. The gun was discharged once in the struggle (the first bullet apparently entered Shorty's arm) and a second time when Shorty had his left hand with the gun above his head. The second shot caused death; the evidence is clear that it entered Shorty's forehead from above and the expert testimony on both sides is consistent with either a deliberate shot from that angle or an accidental discharge in the manner defendant asserted. (There was no evidence of robbery or attempted robbery of the victim; his wallet was found on his person with money in it.)

"Defendant said that right after the shots he found himself holding the pistol by the barrel, with Shorty slumped on the floor. Mrs. Adams screamed and asked what had happened. He responded that Shorty had tried to kill him and that he was leaving. She asked not to be left alone and he told her to come downstairs. When she did they left the house together and walked to the car. He then drove her to the bus station. It is undisputed that he neither sought aid for the dying man nor did he communi-

cate with anyone about the occurrence. He admitted, in cross-examination questions just before the query challenged here, that he did not know whether Shorty was alive or dead when he left the house.

"To complete the summary of the proofs as they stood at the time of the cross-examination involved, reference should be made to further events after the shooting. The state's proofs did not account for defendant's whereabouts after he dropped Mrs. Adams at the bus station until some hours later. A Clementon police officer on patrol noticed a broken window in the Trio Tire establishment (where, it will be recalled, defendant had been employed.) Investigation disclosed defendant asleep on a pile of tires inside. The revolver was found in his pocket. He was charged with breaking and entering and taken to the Camden County jail. (The Clementon police obviously knew nothing about Shorty Owens' death or defendant's connection with it.) Defendant filled in the time interval in his testimony. He said he was very nervous and upset and, after leaving Mrs. Adams at the bus station, bought some more whiskey, drove to the Trio place of business, drank it in the parking lot and fell asleep in the car. When he awoke it was dark and he broke the window to enter and find a place to sleep inside.

"The fact of Shorty's death came to light late in the evening when his son went to his house and found his body. The Camden police were called. At that point they knew nothing about defendant. The pieces were finally fitted together during the night. When Mrs. Adams reached her home in Philadelphia, she told her daughter and son-in-law what had happened. The Philadelphia police were advised and, after some delay, the Camden police were notified and Mrs. Adams went back to Camden and told her story, implicating defendant who was then in the jail on the Clementon charge.

"With the proofs in this posture,[2] the prosecutor opened his cross-examination of defendant by exploring, as previously indicated, the fact that he did not know whether or not Shorty was dead when he left the house and that he did not make any effort to find out. A few questions later the interchange grounding the issue before us took place:

Q Did you ever tell this story to the police?

A No, sir.

Q You are telling us now this shooting was accidental, is that correct?

A It was accidental, sir.

Q But you never told the police that?

A No, sir.

There was no objection by defense counsel until the next morning when counsel asked for 'a curative instruction,' stating that the jury might well have gained the impression that there was some obligation on defendant 'to reveal something to the police,' whereas in law 'there is no obligation under the Constitution to tell the police anything.' The request was refused on the ground that the questions were proper. The judge did say he would in his charge instruct 'that the burden is upon the state and no burden exists upon the defendant.' (The only instruction given in the charge was the general one that the burden to prove defendant guilty beyond a reasonable doubt rested upon the state throughout.)

"The subject was adverted to somewhat differently on two other occasions during the lengthy cross-examination. At one point this took place:

Q And it didn't occur to you to call anybody or tell anybody about what had happened?

A No, sir.

And at another, this exchange occurred:

Q And you didn't tell—up to the time you got to the Camden jail you

2. Defendant had taken the stand in his own defense and testified that the shooting was accidental.

didn't tell anybody about Shorty, did you?

A No, sir.

Q Did you tell anybody about Shorty after you got to the Camden jail?

A No, sir.

Q When was the next time you saw Everline?

A Early that next morning. [At the Camden jail]

Q And after you saw Everline early the next morning, did you tell anybody about what happened to Shorty?

A No, sir.

"This aspect was referred to twice, quite casually, in the prosecutor's summation. I say casually because the theme of the summation, in support of either prong of the state's first degree murder theory, was that, chiefly because of the theft of the car earlier in the day and his breaking into the tire establishment in the evening, defendant was a bad man and out to commit criminal acts. At one point in the summation, this was said:

> The charge here is murder, ladies and gentlemen, and the State is asking for the death penalty. This defendant is no innocent little fellow. The defense makes light of what they admit he did, as if this were nothing at all. These admissions play a significant part, as I hope to demonstrate to you later on, ladies and gentlemen, of the pattern that resulted in the murder charge that we are trying here today, and it is not me or the police or Everline Adams who did anything wrong, but if you so find it is the defendant, this is the man who admitted he wasn't sure that Shorty Owens was dead, but he walked out of the house without even attempting to find out whether Shorty Owens was dead or not and before he does go, what does he do? He doesn't go up to the first person he sees or to the police or anybody and say, 'I just accidentally shot somebody,' which he is trying to tell you he did now. He doesn't do that.

> He goes down to Clementon and breaks into another place, so let's not get any twisted or warped conception from the defense counsel's argument about just what happened here or where the responsibility lies.

Later on, this observation was made:

> He never told the police he accidentally shot Shorty Owens, never, at least up until the time he was lodged in Camden County Jail, and yet he is here, sitting here today asking you to believe this story.

> If this was an accidental shooting, why didn't he go and say, 'I just accidentally shot somebody'?

> He didn't do this, he didn't do this and this fits in, as I said before—I am repeating myself a little bit here —this fits in with our theory that he had something in mind when he took that car off that lot, something in mind of a criminal nature.

"It is to be noted that nowhere in the case was any evidence introduced that defendant had been interrogated by the police at any time about Shorty's death or that he had made any inculpatory or exculpatory statements, had stood mute or claimed his privilege against self-incrimination."

## CONCLUSIONS OF LAW

Petitioner's basic argument is that certain cross examination questions and summation comments relating to his previous failure to volunteer to the police the same exculpatory explanation that he later testified to at trial violated the Fifth Amendment guarantee against compulsory self-incrimination. The State claimed that the normal reaction would have been to tell the police the same version petitioner subsequently testified to at trial and that his failure to do so could properly be considered by the jury as adversely affecting the credibility of his trial testimony. The New Jersey Courts accepted the State's argument and indicated that petitioner waived his constitutional right to remain silent when he took the witness stand in his own defense, thereby sub-

jecting himself to cross examination on any issue relevant to the credibility of his courtroom testimony.

 This court is of the opinion that the writ of habeas corpus must issue because the prosecutor's use of petitioner's silence violated his Fifth Amendment rights.

 Burt was in custody for breaking and entering. There is no trial testimony to indicate that he was interrogated at any time about Shorty's death. Since petitioner was in custody, he had the right to remain silent. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The right to remain silent extends to other offenses about which the police are unaware. Had Burt been interrogated about the murder and remained silent, *Miranda* would govern,[3] for there the Supreme Court said:

> "In accord with our decision today, it is impermissible to *penalize* an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation. (Citations omitted.) *The prosecution may not therefore, use at trial the fact that he stood mute or claimed his privilege in the face of accusation.* 384 U.S. at 468 n. 37, 86 S.Ct. at 1625, 37. (Emphasis added.)

*A fortiori,* the prosecution may not use the fact that an individual did not volunteer exculpatory information about the crime for which he is being tried while being interrogated for other unrelated offenses. This is dictated to the extent that *Miranda* and its progeny so protect the Fifth Amendment privilege. *See* Gillison v. United States, 130 U.S. App.D.C. 215, 399 F.2d 586 (1969); United States v. Mullings, 364 F.2d 173 (2d Cir. 1966). As the Ninth Circuit

Court of Appeals said in Fowle v. United States, 410 F.2d 48, 54 (9th Cir. 1969):

> "It would be anomalous indeed if honorable law enforcement officers were required to elaborate upon the traditional fifth amendment warning and advise arrested persons, in effect: If you say anything, it may be used against you. You have the constitutional right to remain silent, but if you exercise it, that fact may be used against you."

The Supreme Court has cautioned that the value of constitutional privileges can be destroyed if individuals are penalized for exercising them:

> "[Commenting] on the refusal to testify is a remnant of the 'inquisitorial system of criminal justice,' Murphy v. Waterfront Comm'n, 378 U.S. 52, 55, [84 S.Ct. 1594, 1596, 12 L.Ed.2d 678], which the Fifth Amendment outlaws. It is a penalty imposed by courts for exercising a constitutional privilege. It cuts down on the privilege by making its assertion costly."

Griffin v. California, 380 U.S. 609, 614, 85 S.Ct. 1229, 1232, 14 L.Ed.2d 106 (1965). (Footnotes omitted.)

By taking the stand petitioner waived his immunity, but he was not seeking to resume the "cloak" of immunity when cross examination became inconvenient. He testified that he had not made any exculpatory statements when he was arrested; however, he was under no duty to talk to the police, and undoubtedly he could not have foreseen the possible use of that silence against him. It was error to have permitted the challenged questions and summation remarks without the cautionary charge. Therefore, the effect of the prosecutor's questions and closing statements was to penalize[4]

3. The difference between Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), where it was held that the Fifth Amendment forbids the court and prosecutor from commenting on an accused's failure to testify on his own behalf, and the instant case in which there were comments on the accused's failure to make an exculpatory statement, is infinitesimal.

4. The Supreme Court has indicated what it considers a penalty to be:
 "In this context 'penalty' is not restricted to fine or imprisonment. It means, as we said in Griffin v. State of Califor-

Burt for legitimately exercising a Fifth Amendment right. If this court accepts the State's contention that once Burt took the stand his credibility may be impeached by his failure to give exculpatory remarks, then in effect, we are accepting the premise that once a defendant takes the stand, he has waived *all* prior self-incrimination rights, and his legitimate reliance upon the Fifth Amendment may be used against him. This cannot be the law.

This holding recognizes and rejects a position taken by the State: Burt's rights were not violated since his silence was used to impeach and not supply an inference of guilt. Raffel v. United States, 271 U.S. 494, 46 S.Ct. 566, 70 L. Ed. 1054 (1925) is the basis for this position. In that case, a second trial was ordered when the first jury failed to reach a verdict. After relying upon his privilege against self-incrimination by refusing to testify at his first trial, defendant took the stand during the second trial and attempted to refute testimony of a government witness. Over objection, Raffel was compelled to disclose that he had remained silent in the face of the same testimony at the first trial. The Supreme Court concluded that Raffel's silence under the circumstances was inconsistent with his testimony at the second trial and was therefore probative evidence to impeach the credibility of his later testimony.

Specifically, the Court said:

"Failure to deny or explain evidence of incriminating circumstances of which he may have knowledge may be the basis of adverse inference, and the jury may be so instructed. His waiver is not partial; having once cast aside the cloak of immunity, he may not resume it at will, whenever cross examination may be inconvenient or embarrassing." *Id.* at 497, 46 S.Ct. at 568 (Citations omitted.)

The underlying assumption of the *Raffel* opinion (that silence in the face

of accusation is sufficiently inconsistent with later explanatory testimony of innocence as to be of probative value to impeach that testimony) is argued by petitioner to have been rejected in Grunewald v. United States, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957). There one Halpern, one of the defendant-petitioners, was summoned before a grand jury. He refused to answer a series of questions on the asserted ground that his answers might incriminate him. During the trial that followed the indictment, Halpern testified and answered the same questions previously asked by the grand jury in a manner consistent with his innocence. Relying on *Raffel*, the trial judge overruled the objection and allowed the prosecution, for impeachment purposes, to prove that Halpern had earlier refused to answer these questions. Halpern was subsequently convicted.

The Supreme Court reversed the lower court and remanded the case for a new trial. The majority opinion defined the issue raised:

"It is, of course, an elementary rule of evidence that prior statements may be used to impeach the credibility of a criminal defendant or an ordinary witness. But this can be done only if the judge is satisfied that the prior statements are in fact inconsistent. 3 Wigmore, Evidence § 1040. And so the threshold *question here is simply whether, in the circumstances of this case, the trial court erred in holding that Halperin's plea of the Fifth Amendment privilege before the grand jury involved such inconsistency with any of his trial testimony as to permit its use against him for impeachment purposes.*" 353 U.S. at 418–419, 77 S.Ct. at 981. (Emphasis added. Footnotes omitted.)

The Court explained that this question was more narrow than the one raised by *Raffel*. The question now was whether in the circumstances of the case the

cross examination should have been excluded because its probative value on the issue of credibility was so negligible that it was outweighed by its possible impermissible impact on the jury. The High Court ruled that Halpern's silence was *not sufficiently inconsistent* to justify its use for impeachment. The majority specifically declined to overrule *Raffel*.

Taking *Raffel* and *Grunewald* together, it would appear that there might be some circumstances under which "silence", in a Fifth Amendment context, could be used to impeace a witness-defendant, however, such silence must at least be inconsistent with trial testimony of the witness-defendant.

Admittedly, interpreting the consistency or inconsistency of silence is a highly speculative venture. On the basis of an evidentiary evaluation of the transcript, this court can not say that petitioner's custodial silence was inconsistent with his trial version of an accidental shooting. His silence may fairly be construed as reliance on his constitutional rights which is consistent with a subsequent assertion of innocence. *See* Fagundes v. United States, 340 F.2d 673 (1st Cir. 1965).

Finally, the reliance of this court on Miranda v. Arizona, *supra*, is not, as suggested by the State, misplaced in light of Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971).

In *Harris*, defendant was charged with twice selling heroin to an undercover agent. On cross examination defendant was questioned about statements made to the police. These uncounseled statements were taken in violation of *Miranda*, and tended to contradict his previous testimony. The trial judge permitted the cross examination and instructed the jury that the statements could be considered only in passing on defendant's credibility. The Supreme Court affirmed and held that though the earlier conflicting statements were inadmissible to establish the prosecution's case-in-chief under *Miranda*, they could be used to impeach his credibility:

"Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege can not be construed to include the right to commit perjury. *See* United States v. Knox, 396 U.S. 77 [90 S.Ct. 363, 24 L.Ed.2d 275] (1969); *cf.* Dennis v. United States, 384 U.S. 855 [86 S.Ct. 1840, 16 L.Ed.2d 973] (1966). Having voluntarily taken the stand, petitioner was under an obligation to speak truthfully and accurately, and the prosecution here did no more than utilize the traditional truth-testing devices of the adversary process. Had inconsistent statements been made by the accused to some third person, it could hardly be contended that the conflict could not be laid before the jury by way of cross-examination and impeachment." 401 U.S. at 225, 91 S.Ct. at 646.

The instant case does not involve prior inconsistent statements. To include the case at bar within the *Harris* rationale would be to expressly contradict that portion of *Miranda* not faced by the *Harris* Court. This Court refuses to so rule.

Now, therefore it is on this 8 day of May, 1972,

Ordered that the petition of Edward A. Burt for a writ of habeas corpus be and the same hereby is granted.

Furthermore, the execution of said writ shall be stayed, for a period of ninety (90) days to enable the State of New Jersey to initiate proceedings to retry said petitioner for the crimes charged or to appeal to the Third Circuit Court of Appeals.