475 F.2d 234
 UNITED STATES of America ex rel. Edward A. BURT, Appellee,
v.
STATE OF NEW JERSEY and Howard Yeager, the Principal Keeper
of the State Prison at Trenton, New Jersey, Appellant.
 No. 72-1550.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 8, 1973.
Decided March 13, 1973.
 
 George F. Kugler, Jr., Atty. Gen., Trenton, Fred H. Kumpf, Deputy Atty. Gen., Dept. of Law & Public Safety, Division of Criminal Justice, East Orange, N. J., of counsel, for appellant.
 Stanley C. Van Ness, Trenton, Arthur Penn, Newark, N. J., of counsel, for appellee.
 Before McLAUGHLIN, VAN DUSEN and ROSENN, Circuit Judges.
 OPINION OF THE COURT
 PER CURIAM:
 
 
 1
 This appeal disputes the granting by the district court, 342 F.Supp. 188, of defendant-appellee Burt's application for a writ of habeas corpus. The writ was allowed because of the use, by the prosecution, of certain non-conduct of Burt to refute the credibility of his testimony. This was held to be such prejudicial error as to void his conviction. Defendant claimed that he had accidentally shot one Shorty Owens in a scuffle at the decedent's house. The prosecution urges that if it had been actually an accidental shooting, the normal thing for Burt to have done would have been to seek aid for the wounded person, or at least to tell of the accident to someone in authority who could have provided aid to the injured Owens. Since Burt had failed to do this, the prosecution contended that Burt's attitude was inconsistent with his trial testimony, as the State pointed out on cross-examination. It is uncontradicted that Burt told no one he had shot Owens and that he had not sought aid for the man he had killed. He was the only witness in his own defense at the trial. He took the stand voluntarily and stated that the shooting was accidental, coming in the course of and resulting from a fight he had with Shorty Owens, and which, he claimed, the latter had started.
 
 
 2
 Burt was convicted of murder in the second degree by a jury on July 16, 1967 and was sentenced to from 25 to 30 years in prison. The decision was affirmed by the New Jersey Superior Court, Appellate Division and the New Jersey Supreme Court. Certiorari was denied by the United States Supreme Court. The habeas corpus writ was later granted by a judge of the United States district court for New Jersey. The basis for that action by the district judge was because he considered that the usage of defendant's prior silence had been improper and had impeached Burt's credibility as a witness.
 
 
 3
 The trial disclosed two completely contradictory accounts of what had happened to Owens. One was that of a Mrs. Adams who was in the upstairs portion of the Owens' house at the time of the shooting. She testified that she heard some disturbance, a groan, and a shot from a gun downstairs. After hearing a second shot, she heard someone fall to the floor after which defendant immediately came up the stairs, with a gun in his hand. He said Shorty was dead, that he was going to kill her and "blow your brains out just like a [sic] blowed his out." She also stated as a witness that Burt then raped her and forced her to accompany him to his car.
 
 
 4
 Defendant's story on the witness stand was vastly different. He said that Shorty had implied that he, Burt, was flirting with Mrs. Adams, and that soon after some verbal disagreement, Shorty pointed the revolver at him. He jumped up and tried to wrestle the gun from Shorty and in the scuffle the gun went off twice. As a result, Shorty was shot; once in the arm and then in the top of the head. Burt said that he then heard Mrs. Adams scream and ask what had happened, and that he told her that Shorty had tried to kill him and that he was leaving. He asserted that she asked him not to leave her alone, and so he told her to come downstairs which she did and then he drove her to the bus station.
 
 
 5
 It is not contested that Burt neither sought aid for the dying man or communicated with anyone about the occurrence. Burt admits that he did not know whether Shorty was alive or dead when he left the latter's house. The evidence given by Mrs. Adams and that mentioned by Burt was the only testimony presented regarding the circumstances of Shorty Owens' death. Later that same evening, a Clemonton, New Jersey, police officer noticed a broken window in the Trio Tire store. Clemonton is in Camden County, New Jersey, near the city of Camden, and Burt had previously been employed at that store. Defendant was found asleep on a pile of tires inside the store, with the revolver in his pocket. As a result of this alone, Clemonton police arrested Burt and charged him with breaking and entering. The connection of defendant with the killing of Shorty was not made until late that evening, long after the arrest of Burt, and after Mrs. Adams had reached her home in Philadelphia. Shorty's son had found his father's body and had notified the Camden police department. Mrs. Adams contacted Philadelphia police and after considerable confusion, the police departments involved pieced the story of Shorty's death together.
 
 
 6
 On cross-examination of defendant at trial, he was asked why he never told anyone what had happened, and he had no explanation. That thought was referred to in the prosecutor's summation. The purpose of such questioning by the prosecutor was to attack the credibility of defendant's testimony as above mentioned on the theory that in the course of an accidental death, the person responsible for it would try and obtain help for the injured man. Burt did clearly testify that he did not know Shorty's condition when he left him.
 
 
 7
 In Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the general rule is set out that the prosecution may not use at trial the fact that someone stood mute or claimed his privilege in the face of accusation. However, in Harris v. New York, 401 U.S. 222, 226, 91 S.Ct. 643, 646, 28 L.Ed.2d 1 (1971), the United States Supreme Court held: "Had inconsistent statements been made by the accused to some third person, it could hardly be contended that the conflict could not be laid before the jury by way of cross-examination and impeachment." Harris prevents the use of perjury by way of a defense in order to free a witness from the risk of legitimate confrontation with admissible inconsistent utterances. In the highly regarded United States v. Ramirez, 441 F.2d 950 (5 Cir. 1971), cert. den. 404 U.S. 869, 92 S.Ct. 91, 30 L.Ed.2d 113, the Fifth Circuit decided that once a defendant elected to testify and assert the defense of coercion, he became subject to the traditional truth testing device of the adversary process, including the right of the prosecution to show his prior inconsistent act of remaining silent at the time of his arrest. The threshold query becomes then, whether petitioner's failure to check on or in some way aid the person whom he had just shot, is consistent with his trial assertion that the shooting was accidental. It seems, as it did to the trial court before which he was physically present and could be heard and observed, that a man who had just accidentally shot his friend and was unaware of the person's resultant condition, would seek aid, or at least tell someone so that help could be obtained. Burt was arrested later that evening by police for breaking and entering the tire store. That arrest was in no way connected with the shooting of Shorty Owens. Burt made no mention to the police of what had happened to Owens. Under the circumstances appellant was not claiming a privilege in the face of the accusation of killing Owens as in Miranda. What Burt was accused of by the police was breaking and entering the tire store.
 
 
 8
 All of the cases cited by defendant-appellee discuss the right to remain silent and the privilege against self-incrimination as protected by the Fifth Amendment through Miranda. The purpose of the rule is to see to it that the person accused of a crime cannot be forced to admit having committed it while under duress of any kind. In this instance, insofar as the shooting was concerned that problem did not exist. Had Burt commented on the shooting, it would not have been to refute an accusation. The police had arrested and detained Burt solely on the charge of breaking and entering. There was no reason for him not to comment on the allegedly accidental shooting. Therefore the basis for the necessity of Fifth Amendment protection did not exist in the then situation. It would have been totally unjustifiable to preclude the use of Burt's prior inconsistent conduct when showing the unreliability of defendant's testimony during cross-examination.
 
 
 9
 In any event, the acceptance of that non-action in no way affected the substantial rights of defendant in the murder trial. As is seen there were no legitimate grounds for disturbing the judgment of the state court in this matter. 7 Moore's Fed.Pract. 61. Burt's version of Owens' death left many questions unanswered, in the light of the facts before us. First, there was the evidence of Mrs. Adams, who stated that she had been raped by appellant, right after he had told her that he had shot Shorty. It was conceded that both men had consumed considerable alcohol while drinking together for some time that afternoon. Burt did nothing to check on Shorty's condition after the shooting. Since Mrs. Adams seems to have been a very good friend and frequent companion of Shorty's, it is reasonable that she would have desired to assist him had she been allowed. Burt confessedly did kill Owens in a fight and it was his second shot that caused the death, after Owens had already been weakened by an arm wound. The jury had adequate basis to make its findings and weigh the credibility of the testimony of the witnesses, without the aid or influence of the contested evidence.
 
 
 10
 The judgment of the district court will be reversed and the case will be remanded so that the district court may enter an order denying the petition for a writ of habeas corpus.
 
 
 11
 ROSENN, Circuit Judge (concurring).
 
 
 12
 I concur. The crucial question in this appeal is whether a defendant's silence in the face of police suspicion can be used at trial to impeach him after he has voluntarily taken the stand and offered testimony which is contradictory to his earlier silence. I believe the Supreme Court's holding in Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), requires that the question be answered in the affirmative.
 
 
 13
 In his direct examination, Burt testified that the shooting of Owens was accidental. On cross-examination Burt was asked if he had told the police of the accidental shooting:
 
 
 14
 Q. And you didn't tell-up to the time you got to the Camden jail-you didn't tell anybody about Shorty, did you?
 
 
 15
 A. No, Sir.
 
 
 16
 Q. Did you tell anybody about Shorty after you got to the Camden jail?
 
 
 17
 A. No, Sir.
 
 
 18
 Q. When was the next time you saw Everline [Adams]?
 
 
 19
 A. Early that next morning.
 
 
 20
 Q. And after you saw Everline early the next morning, did you tell anybody what happened to Shorty?
 
 
 21
 A. No, Sir.
 
 
 22
 By the time he saw Everline Adams, Burt was in custody and was suspected of the murder. He therefore had a constitutional right under the fifth amendment to remain silent. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); Fowle v. United States, 410 F.2d 48 (9th Cir. 1969); Gillison v. United States, 130 U.S.App.D.C. 215, 399 F.2d 586 (1968); United States v. Mullings, 364 F.2d 173 (2d Cir. 1966).
 
 
 23
 In Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), the Supreme Court held that a defendant's statements to police could be used to impeach his at-trial testimony even if they had been obtained in violation of Miranda. The Court said:
 
 
 24
 Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury. . . . Having voluntarily taken the stand, petitioner was under an obligation to speak truthfully and accurately, and the prosecution here did no more than utilize the traditional truth-testing devices of the adversary process. . . .
 
 
 25
 The shield provided by Miranda cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances.
 
 
 26
 401 U.S. at 225-226, 91 S.Ct. at 645-646. If the shooting was accidental as claimed by Burt, his silence both before he was a suspect and after was inconsistent with his at-trial testimony that the shooting was accidental. Such inconsistency, Harris holds, must be subject to the truth-seeking process of cross-examination. I perceive no difference between impeachment by prior inconsistent statements made in the absence of a Miranda warning and impeachment by prior silence inconsistent with trial testimony which justifies not applying the Harris rationale in the present case. Accord, United States v. Ramirez, 441 F.2d 950 (5th Cir.), cert. denied, 404 U.S. 869, 92 S.Ct. 91, 30 L.Ed.2d 113 (1971).
 
 
 27
 The lesson of Miranda was that defendants should be protected from compulsion to incriminate themselves. Harris, although recognizing the need for such protection, limited the prophylactic rules devised by the Court to accomplish that result. In weighing the value to society of ascertaining the truth in the judicial process against the value to the individual of protection against self-incrimination, the Court determined that the former value must under some circumstances be given priority when the two values conflict directly. Burt's silence after he became a suspect may also be interpreted as an exercise of his right not to incriminate himself. The silence, however, was inconsistent with his testimony at trial that the shooting was accidental. Such inconsistency should be available to the prosecutor in his use of the traditional cross-examination process of the adversarial system. If inconsistencies cannot be demonstrated to a jury, the truth-seeking process is straitjacketed. The defendant, of course, is free to explain away seeming inconsistencies. The adversarial system requires that the jury, as triers of fact, make the final determination of which testimony and conduct to believe.
 
 
 28
 Appellee argues, and the district court suggested, that prosecutorial questioning about silence should be prohibited because of the principles enunciated in Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). Griffin held that, because adverse prosecutorial comment or judicial instructions on the failure of a defendant to take the stand at trial makes costly this exercise of the right against self-incrimination, such statements made to a jury are unconstitutional. Appellee thus argues that allowing the prosecutor in the present case to ask defendant about his failure to tell the police of the alleged accidental shooting equally makes costly his exercise of the right against self-incrimination. I disagree. I believe appellee's argument misconceives the thrust of Griffin.
 
 
 29
 Griffin does talk of the impermissibility of putting a price on exercise of a constitutional right. It says of comment on the refusal to testify:
 
 
 30
 It is a penalty imposed by courts for exercising a constitutional privilege. It cuts down on the privilege by making its assertion costly.
 
 
 31
 380 U.S. at 614, 85 S.Ct. at 1232-1233. I do not see that Griffin applies to a situation where a defendant takes the stand and his credibility is tested by prior inconsistent conduct.
 
 
 32
 The cross-examination was not directed at appellee's failure to speak in the face of self-incrimination. It was aimed at his failure to act in the face of alleged innocent conduct. Under the fifth amendment he was under no obligation to take the stand under any circumstances and, under Griffin, there could be no prosecutorial comment. Once, however, he took the stand, he subjected himself to the traditional truth-testing tools of our accusatory system, including an obligation to explain his unnatural behavior after a friend was mortally wounded by an allegedly accidental shooting.
 
 
 33
 Griffin's disapproval of the imposition of a price on a defendant's exercise of his right against self-incrimination must be understood in the context of the values protected by the fifth amendment. The Court, although not explicating those values in Griffin itself, did do so in denying retroactive application to its holding, in Tehan v. Shott, 382 U.S. 406, 414, 86 S.Ct. 459, 464, 15 L.Ed.2d 453 (1966):
 
 
 34
 It follows that the "purpose" of the Griffin rule is to be found in the whole complex of values that the privilege against self-incrimination itself represents, values described in the Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653, case as reflecting "recognition that the American system of criminal prosecution is accusatorial, not inquisitorial, and that the Fifth Amendment privilege is its essential mainstay. . . . Governments, state and federal, are thus constitutionally compelled to establish guilt by evidence independently and freely secured, and may not by coercion prove a charge against an accused out of his own mouth." [Emphasis added.]
 
 
 35
 Delineation of the values underlying the right against self-incrimination emphasizes the crucial significance of use of the word "compelled" in the fifth amendment: "nor shall be compelled in any criminal case to be a witness against himself." Proscribed by the fifth amendment is not self-incrimination per se, but, rather, compelled self-incrimination. Maintenance of an accusatorial system requires not that individuals never incriminate themselves, but merely that they not be compelled to do so. Protection of the human personality and prevention of government intrusion similarly require only that self-incrimination not be compelled.
 
 
 36
 In Griffin, the Court expressed concern that prosecutorial or judicial comment on the failure of a defendant to testify would compel him to waive his right against self-incrimination. The Court suggested that what it said in Wilson v. United States, 149 U.S. 60, 66, 13 S.Ct. 765, 37 L.Ed. 650 (1893), about the federal statute, 18 U.S.C. Sec. 3481, prohibiting the creation of any presumption from defendant's failure to testify, reflects the spirit of the self-incrimination clause:
 
 
 37
 ". . . [the clause] was framed with due regard also to those who might prefer to rely upon the presumption of innocence which the law gives to every one, and not wish to be witnesses. It is not every one who can safely venture on the witness stand, though entirely innocent of the charge against him. Excessive timidity, nervousness when facing others and attempting to explain transactions of a suspicious character, and offenses charged against him, will often confuse and embarrass him to such a degree as to increase rather than remove prejudices against him."
 
 
 38
 380 U.S. at 613, 85 S.Ct. at 1232. The Court was concerned not merely that adverse comments on the failure to testify placed a cost on exercise of the right against self-incrimination, but, moreover, that this cost was great enough to compel some defendants to take the stand and testify.
 
 
 39
 At the point where Burt chose to remain silent, thus exercising a right against self-incrimination, it is doubtful that any compulsion existed. Burt was never interrogated about the Owens murder by the police. No official ever suggested to him that he should speak. Compulsion would have existed only if defendant realized that he might be asked at trial to explain his silence should his trial testimony prove inconsistent with silence while in incarceration. The coercive effect of such a realization, although perhaps real, is minimal. I do not find it substantial enough to raise the defendant's right against self-incrimination over society's interest in using the methods of the adversarial process to discover truth. Griffin protected Burt from adverse comment if he refused to take the stand. Once he freely elected to testify, however, his testimony was uncoerced and society had a paramount stake in ascertaining the truth. In such a situation, the limitations of Griffin are inapplicable.[1]
 
 
 40
 I therefore concur in the reversal of the judgment of the district court. The case should be remanded with instruction to the court to deny the petition for writ of habeas corpus.
 
 
 41
 Judge VAN DUSEN concurs in this opinion.
 
 
 
 [1]
 See language quoted from Harris v. New York at page 237 supra. The two sentences (401 U.S. at 225, 91 S.Ct. at 645) immediately preceding that language read as follows:
 The impeachment process here undoubtedly provided valuable aid to the jury in assessing petitioner's credibility, and the benefits of this process should not be lost, in our view, because of the speculative possibility that impermissible police conduct will be encouraged thereby. Assuming that the exclusionary rule has a deterrent effect on proscribed police conduct, sufficient deterrence flows when the evidence in question is made unavailable to the prosecution in its case in chief.