Attilio **AGNELLINO**, Appellant,

v.

**STATE OF NEW JERSEY** and Howard Yeager, Principal Keeper, New Jersey State Prison, Appellees.

No. 73–1134.

United States Court of Appeals, Third Circuit.

Argued Sept. 24, 1973.

Decided Feb. 13, 1974.

15 U.S.C. § 1115(b)(5).

Robert I. Ansell, Anschelewitz, Barr, Ansell & Bonello, Asbury Park, N. J., for appellant.

Edward A. MacDuffie, Asst. Pros., Monmouth County, Freehold, N. J., James M. Coleman, Jr., Asbury Park, N. J., and Frederick J. Kalma, Old Bridge, N. J., for appellees.

Before SEITZ, Chief Judge, HUNTER and WEIS, Circuit Judges.

JAMES HUNTER, III, Circuit Judge:

In May of 1970 in the Monmouth County Court of New Jersey, appellant was tried before a jury and convicted on two counts of receiving stolen property in violation of N.J.Stat. 2A:139–1. Appellant unsuccessfully appealed his conviction through the New Jersey courts and the Supreme Court of the United States denied certiorari. Appellant then petitioned the district court for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 et seq., alleging improper comments by the state prosecutor in his summation and lack of probable cause to support a search warrant. The district court denied the petition and this appeal followed. We affirm.

On November 30, 1967, a magistrate in the City of Long Branch, New Jersey, issued a warrant to a New Jersey State Police officer to search the Paddock Lounge and Restaurant, a business estab-lishment alleged to be owned and operated by appellant. As a result of the search of the Paddock Lounge premises, two rolls of stolen carpeting and three stolen air conditioners, among other things, were seized from a shed behind the Lounge. During the course of the search, appellant was arrested[1] and given his *Miranda* warnings. The police shortly thereafter questioned appellant about the carpet and air conditioners. A police officer testified that appellant stated that he "had a good buy" on the carpeting and that "he had paid about $150," for each of the air conditioners. There was also testimony that in reply to whether the air conditioners were "hot or stolen," appellant stated, "[f]or that price I wouldn't be surprised." Appellant, however, flatly denied having said this. It does not appear that police followed this up by asking appellant from where or from whom he had purchased the air conditioners and he did not volunteer this information.

In discussing the credibility of the defendant, the prosecutor in his summation said:

"Now, you take Mr. Agnellino's story. And you consider the logic of the story. Start right off the bat the night of the raid, the police come, Lieutenant King and I forget the number, you may recall it, a number of police officers are on the scene. They go into this shed.

"[S]ay this stuff was coming into your shed and you had three air conditioners and six rolls of rugs. And there's an indication they are looking for stolen property. Logically what would a normal human being do in that situation? I know what you would do and you know what I would do. I'd say wait a minute, let's find Bill Gordon, that's where I got those air conditioners from, let's find the interior decorator in Camden" (from whom appellant alleged he bought the carpeting).

---

1. Prior to the search, the police had obtained an arrest warrant for appellant for receiving stolen television sets.

Appellant's attorney objected on the ground that no defendant should be penalized for taking shelter in his constitutional right to remain silent, especially where the police have given the defendant *Miranda* warnings. The trial court ruled the remarks to be "fair comment" and permitted the prosecutor to continue:

"So I was saying in assessing Mr. Agnellino, I think you have a right to say that to yourself. Well, what would a normal human being do when the police are there? There's a raid going on and the property apparently has been stolen and it just doesn't ring true, this man if he didn't have some guilty knowledge wouldn't have done that. And that's what you're looking for in this case." [2]

## I

■ Appellant argues that the state trial court infringed his fifth amendment rights by permitting the prosecutor to comment during summation on appellant's failure at the time of arrest to voluntaily inform the police from whom and from where he had obtained the goods.

The Supreme Court has held that it is impermissible for a prosecutor to introduce as *evidence of guilt* the fact that an accused failed to testify in his own behalf or that he remained silent at the time of arrest. *See* Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965).[3] Recently, however, the Supreme Court emphasized that "[i]t does not follow from *Miranda* that evidence inadmissible against an accused in the prosecution's case in chief is barred for all purposes." Harris v. New York, 401 U.S. 222, 224, 91 S.Ct. 643, 645, 28 L.Ed.

2d 1 (1970). The Court in *Harris* then concluded that once a defendant freely testifies in his own behalf, the fifth amendment does not bar a prosecutor from introducing for *impeachment purposes* evidence of prior statements inconsistent with defendant's testimony at trial. *Harris* refused to allow the "shield provided by *Miranda*" to be perverted into a "license to use perjury by way of a defense", free from the truth-testing device of cross-examination. *Harris, supra,* at 226, 91 S.Ct. at 646

Both concurring judges would rely on *Harris* by viewing this case as involving prosecutorial comment on the defendant's prior inconsistent *statements*. Chief Judge Seitz characterizes appellant's trial testimony as conveying the picture of appellant having purchased these goods in a "course of business" transaction and concludes that this "differs markedly from the impression" conveyed by appellant's statements to police "both in choice of words and in the details offered." Judge Weis refers to the "variations between the tenor" of appellant's statements at time of arrest and his testimony at trial. I do not agree with this analysis.

A police officer testified that at the time of arrest and after being given *Miranda* warnings appellant stated that he had received "a good buy" on the carpeting and had paid about $150 for each air conditioner. The prosecutor in summation suggested a "normal human being" in that situation would have said, "wait a minute, let's find Bill Gordon, that's where I got those air conditioners from, let's find the interior decorator in Camden" (essentially appellant's trial testimony).

There is nothing in the record to suggest that appellant's statements were in-

---

2. Appellant concedes in his brief that the prosecutor made these statements in the context of the credibility of appellant. Brief for Appellant at 5. Moreover, the record shows that following these comments, the prosecutor then went on to discuss the concept of guilty knowledge and inferences which might be drawn from the facts.

Transcript of Trial Proceedings at 214, et seq.

3. In *Griffin* the Supreme Court held that a prosecutor cannot comment on the accused's silence nor can the court instruct the jury that such silence is evidence of guilt. The defendant in *Griffin did not* take the stand in his own behalf.

complete responses to the questions asked by the police[4] and appellee has never disputed appellant's position on this appeal that the police never inquired from whom or from where he had obtained the goods (information which the prosecutor suggested · appellant should have volunteered). Moreover, in view of the importance the Supreme Court has attached to the giving of *Miranda* warnings, it is significant that the police informed appellant that he could "stop and cease answering questions . . . at any time."

More than this, however, I do not believe that appellant's statements were inconsistent. To tell the police that you paid $150 for each air conditioner and then to tell the jury that you bought them from a named individual who operated an air conditioning business at a specified location involves no inconsistent utterances. This is equally true of appellant's statement to the police that he had a good buy on the carpet and his subsequent statement to the jury that he bought the carpet from an interior decorator in Camden. These statements might be considered inconsistent only in the sense that appellant's statements at time of arrest were not as complete as those he made at trial. To characterize this inconsistency as "differences in statements" is of course not erroneous, but in my view does not go far enough; the "differences" derive not from what appellant *said* at time of arrest,[5] but from what he *did not say*. This failure to inform the police of the source of the goods was precisely what the prosecutor focused upon in his summation; thus, the prosecutor attempted to impeach appellant's credibility by prior *silence*, not by prior inconsistent statements.[6]

Although I believe such silence may be the subject of comment by a prosecutor once the appellant has freely chosen to testify, to permit such comment under the banner of "inconsistent statements" does not seem consonant with the pronouncement in *Miranda* that the fifth amendment privilege is not "waived" if the individual answers some questions or gives some information on his own prior to invoking his right to remain silent when interrogated."[7]

To be consistent with *Miranda* and *Harris*, I believe we must recognize that appellant was validly exercising his fifth

4. We are therefore not concerned with the situation confronting the Fourth Circuit in United States v. Moore, 484 F.2d 1284 (4th Cir. 1973).

5. Chief Judge Seitz is quite correct in noting that according to the testimony of a police officer, appellant stated at time of arrest that he had paid $150 for each air conditioner (although the police officer was not sure of the exact figure). At trial appellant testified he had paid $175 for each air conditioner. I agree that these are true inconsistent statements under the rationale of *Harris*. But since the prosecutor did not comment on this inconsistency, it is not relevant to our decision.

6. Chief Judge Seitz refers to testimony of a police officer that appellant stated that in light of the price paid, he would not be surprised if the air conditioners were "hot". (Appellant denied he ever said this.) He then suggests that this statement might be inconsistent with appellant's trial testimony which he labels as representations that the air conditioners were purchased in a "course of business" transaction.

In my view this presents several problems. First, I seriously question whether we can characterize appellant's trial testimony as a representation that he bought the air conditioners in a "course of business" transaction. Second, even if we were to accept this characterization of his trial testimony, I do not believe that it is necessarily inconsistent with the statement, "[f]or that price, I wouldn't be surprised [if they were hot]." Third, even if the "hot" statement is truly inconsistent with appellant's trial testimony, the prosecutor did not comment on it; he only commented on what appellant did not say. Fourth, in any event, this argument has no relevance to the parallel issue of the prosecutor's comments on appellant's silence with respect to the source of the *carpet*.

7. 384 U.S. at 475–476, 86 S.Ct. at 1628. It is well settled that a witness before a grand jury may not in certain circumstances decide to answer only some questions, Rogers v. United States, 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344 (1951), and a defendant who testifies at trial may not claim the fifth amendment privilege against cross-examination on matters reasonably related to the subject

amendment privilege when he refrained from volunteering to the police the information suggested by the prosecutor in his summation. Viewed in this manner, the question confronting us is whether the "prior inconsistent statement" rationale of *Harris* should be extended to permit impeachment by comment on appellant's silence at time of arrest. Perceiving no difference between the two, this Court held in United States ex rel. Burt v. New Jersey, 475 F.2d 234 (3d Cir. 1973), that *Harris* extends to impeachment by prior inconsistent silence. While I believe that *Burt* controls the issue raised by appellant, in view of a contrary opinion by at least one concurring judge, a brief analysis of *Burt* seems necessary.

In that case, defendant Burt testified at trial that he had accidentally shot the decedent. It was uncontradicted, however, that Burt neither told anyone about the shooting nor sought aid for the person he had shot. Later that same evening of the shooting, Burt was arrested for unlawfully breaking and entering a store. It was not until after this arrest and later that same evening that the police connected Burt with the shooting. He was placed in jail and apparently at no time prior to trial did he tell police or anyone else of the allegedly accidental nature of the shooting. Burt was never interrogated about the shooting and its is not discernible whether he had been given any *Miranda* warnings. When cross-examined at trial,

Burt gave no explanation as to why he never told anyone of the alleged accident or why he never sought aid for the decedent. The prosecutor then referred to this in his summation.

In a per curiam decision in which two judges concurred by separate opinion, this Court held that the rationale of *Harris* extended to the cross-examination of Burt concerning his prior silence. While the two opinions in *Burt* emphasize different considerations in arriving at this result, both opinions cited with approval the view expressed by the Fifth Circuit that *Harris* applies to impeachment by prior silence inconsistent with trial testimony. United States v. Ramirez, 441 F.2d 950 (5th Cir.), cert. den. 404 U.S. 869, 92 S.Ct. 91, 30 L.Ed.2d 113 (1971).[8]

Notwithstanding this reference to *Ramirez*, there is language in Judge McLaughlin's per curiam opinion which might suggest that the holding of *Burt* is limited only to impeachment by prior inconsistent silence which *does not occur in the face of police accusation.* This limitation apparently was thought to be required by the language in *Miranda* that "the prosecution may not use at trial the fact that someone stood mute or claimed his privilege *in the face of accusation."* [9]

However, the concurring opinion, which is the majority opinion and hence controlling,[10] noted that even after Burt became suspected of the murder he never

---

matter of his direct examination. *See e. g.,* Brown v. Walker, 161 U.S. 591, 597–598, 16 S.Ct. 644, 40 L.Ed. 819 (1896); Brown v. United States, 356 U.S. 148, 78 S.Ct. 622, 2 L.Ed.2d 589 (1958). *Miranda* held, however, that these principles do not apply to the interrogation situation because "[n]o legislative or judicial fact-finding authority is involved . . . nor is there a possibility that the individual might make self-serving statements of which he could make use at trial while refusing to answer incriminating statements." 384 U.S. 476 n. 45, 86 S.Ct. 1629.

8. In *Ramirez* the defendant testified at trial that he had been coerced into selling heroin by strangers who had threateneed harm to

him and his family. The defendant further testified that he consequently desired to be arrested so he would no longer be compelled to sell heroin. On cross-examination the prosecutor elicited from the defendant the testimony that he had never told the police this story prior to trial. From this the prosecutor argued on summation that the defendant was lying. On appeal the Fifth Circuit approved this form of impeachment, relying on *Harris.*

9. *Burt, supra* at 236, of 475 F.2d, citing Miranda v. Arizona, 384 U.S. 436, 468 n. 37, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (Court's emphasis).

10. Judge Rosenn wrote the concurring opinion in which Judge Van Dusen joined.

told the police or anyone else of the alleged accidental nature of the shooting. Thus, it framed the issue as "whether a defendant's silence *in the face of police suspicion* can be used at trial to impeach him after he has voluntarily taken the stand and offered testimony which is contradictory with his earlier silence." [11] The clear import of the majority opinion is that in light of *Harris*, silence, even in the face of police suspicion, may be used for *impeachment* purposes once an accused has freely taken the stand in his own behalf. As aptly stated in the concurring opinion:

> "Burt's silence *after he became a suspect* may also be interpreted as an exercise of his right not to incriminate himself. The silence, however, was inconsistent with his testimony at trial that the shooting was accidental. Such inconsistency should be available to the prosecutor in his use of the traditional cross-examination process of the adversarial system. If inconsistencies cannot be demonstrated to a jury, the truth-seeking process is straightjacketed. The defendant, of course, is free to explain away seeming inconsistencies. The adversarial system requires that the jury, as triers of fact, make the final determination of which testimony and conduct to believe." [12]

Chief Judge Seitz, however, suggests in his concurrence that this Court in *Burt* was not concerned with "defendant's failure to offer an exculpatory statement to rebut accusation but with his failure to act, to summon help." I cannot agree with this distinction in view of the repeated references in the majority opinion in *Burt* to appellant's

failure to *tell* the police (silence) or to *seek* aid (conduct) both before and *after* he was in police custody and suspected of the murder. Indeed, comment upon an appellant's silence at a time when he knew the victim was dead [13] logically had no relevance to appellant's failure to seek aid but was relevant only to appellant's failure to exonerate himself in the face of police accusation. [14]

I thus believe that on its facts *Burt* involved impeachment by *silence* in the face of police accusation as well as impeachment by *conduct*; hence *Burt* controls the present situation. However, because this panel remains divided on the applicability of *Burt*, I shall set forth fully my views on this constitutional issue.

In Raffel v. United States, 271 U.S. 494, 46 S.Ct. 566, 70 L.Ed. 1054 (1926), the Supreme Court held that a defendant's testimony at a retrial could be impeached by cross-examination which disclosed that the defendant, in the face of similar prosecution testimony, had chosen not to testify at his first trial. "His waiver is not partial; having once cast aside the cloak of immunity, he may not resume it at will . . . . ." [15]

In Grunewald v. United States, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957), the Supreme Court held that the trial court erred in permitting the cross-examination of an individual concerning his refusal (in the form of a statement) to answer questions previously asked him by a grand jury. However, perceiving the problem as a question of the probative value of such evidence, the Court noted that the determination of "whether a prior statement is sufficiently inconsistent to be allowed to go to the

11. *Burt, supra* at 237 of 475 F.2d (emphasis added).

12. *Burt, supra* at 238 (emphasis added).

13. Since appellant had been confronted with police suspicion that he had committed the murder, it does not seem unwarranted to conclude that Burt knew his victim was dead and hence that aid would be unavailing.

14. Nor do I consider it significant that Burt, unlike appellant, might not have been given

any *Miranda* warnings. It would indeed be an anomalous decision which twists the rationale of *Miranda* to hold that an accused who is given *Miranda* warnings and remains silent, has greater rights than one who, though not having been so informed, remains silent presumably in reliance to the same extent on his rights under the fifth amendment.

15. 271 U.S. at 497, 46 S.Ct. at 568.

jury on the question of credibility is usually within the discretion of the trial judge." [16]

The Court in *Grunewald* did not undermine the decision in *Raffel*.[17] It did hold, however, that *Raffel* had not established as a matter of law that prior silence must *always* be deemed inconsistent with later assertions of innocence. The Court then analyzed the peculiar situation which the petitioner in *Grunewald* faced when confronted by the grand jury inquiry and concluded that his exercise of the privilege before the grand jury was entirely consistent with later assertions of innocence and thus inadmissible for impeachment purposes because void of any probative value: [18]

"Had he answered the questions put to him before the grand jury in the same way he subsequently answered them at trial, this nevertheless would have provided the Government with incriminating evidence from his own mouth. For example, had he stated to the grand jury that he knew Grunewald, the admission would have constituted a link between him and a criminal conspiracy, and thus would be true even though he was entirely innocent and even though his friendship with Grunewald was above reproach. There was, therefore, as we see it, no inconsistency between [petitioner's] statement to the grand jury that answering the question whether

he knew Grunewald would tend to furnish incriminating evidence against him, and his subsequent testimony at trial that his acquaintance with Grunewald was free of criminal elements." [19]

Thus, the Court impliedly recognized that evidence of silence is subject to ambiguous inferences which may diminish its reliability, yet only where one's prior silence is quite clearly consistent with innocence,[20] and thus void of any probative value, did the Court believe this evidentiary question arises to constitutional dimensions. Cf. Spencer v. Texas, 385 U.S. 554, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967) (evidence of prior convictions admissible notwithstanding some prejudicial effect); Michelson v. United States, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948) (impeachment of character witness by use of defendant's prior convictions).

Moreover, appellant's situation at time of arrest should be contrasted with that confronting the appellant in *Grunewald:*

"For many innocent men who know that they are about to be indicted will refuse to help create a case against themselves under circumstances where lack of counsel's assistance and lack of opportunity for cross-examination will prevent them from bringing out the exculpatory circumstances in the context of which superficially incriminating acts occurred." [21]

16. Grunewald v. United States, 353 U.S. at 423, 77 S.Ct. at 983.

17. The *Grunewald* Court stated:
"[W]e may assume that under *Raffel* [the defendant] was subject to cross-examination impeaching his credibility just like any other witness, and *that his Fifth Amendment plea before the grand jury could not carry over any form of immunity when he voluntarily took the stand at trial.*" 353 U.S. at 420, 77 S.Ct. at 982 (emphasis added).

18. The Court in *Raffel* approached the issue in a similar fashion. It noted:
"If, therefore, the questions asked of defendant were logically relevant, and competent within the scope of the rules of cross-examination, they were proper questions, unless there is some reason of poli-

cy in the law of evidence which requires their exclusion." 271 U.S. at 497, 46 S.Ct. at 568.
The Court then suggested that had defendant not testified at retrial, evidence that he remained silent during the first trial would be inadmissible because probative of no fact in issue (other than issue of guilt).

19. 353 U.S. at 421–422, 77 S.Ct. at 982.

20. As the *Grunewald* Court noted, "[r]ecent re-examination of the history and meaning of the Fifth Amendment has emphasized anew that one of the basic functions of the privilege is to protect *innocent* men." Grunewald v. United States, at 421 of 353 U.S., at 982 of 77 S.Ct. (Court's emphasis).

21. 353 U.S. at 423, 77 S.Ct. at 983.

Appellant was not denied assistance of counsel; indeed he chose not to seek counsel. Nor were appellant's replies restricted by the scope of the questions asked; he was free to fully explain answers which initially might have appeared superficially incriminating. Lastly, I do not think that appellant's statements at trial—if in fact made by appellant at time of arrest—could have been erroneously construed by the police as inculpating appellant. Thus, I do not believe we are faced with a *Grunewald*-type situation.[22]

Nor do I believe that the mere passage of time has rendered *Raffel* and *Grunewald* inapplicable. I think that *Harris* and other recent decisions are consistent with and supportive of *Raffel* and *Grunewald*, *Harris* held that evidence inadmissible under *Miranda* in the prosecution's case in chief is nonetheless admissible for impeachment purposes provided 1) the defendant freely chooses to take the stand, and 2) the "trustworthiness of the [impeachment evidence] satisfies legal standards."[23]

Particularly revealing are the dissenting arguments of Justice Brennan, with whom Justices Douglas and Marshall joined:[24]

> "*Griffin* held that comment by the prosecution upon the accused's failure to take the stand or a court instruction that such silence is evidence of guilt is impermissible because it 'fetters' that choice—'[i]t cuts down on the privilege by making its assertion

costly.' . . . For precisely the same reason the constitutional guarantee forbids the prosecution from using a tainted statement to impeach the accused who takes the stand: The prosecution's use of the tained statement 'cuts down on the privilege by making its assertion costly.' . . . Thus, the accused is denied an 'unfettred' choice when the decision whether to take the stand is burdened by the risk that an illegally obtained prior statement may be introduced to impeach his direct testimony denying complicity in the crime charged against him."[25]

Justice Brennan suggested that the *Miranda* Court had resolved this question when it had stated in dictum that impeachment evidence was just as incriminatory as direct evidence.[26]

The majority of the Supreme Court in *Harris* did not accept these arguments. I therefore can only conclude that *Harris* has held that the policies of the fifth amendment prohibition against compelling a person to be a "witness against himself" are not impaired by subjecting a defendant who has freely taken the stand to impeachment by probative evidence otherwise inadmissible as evidence of guilt under *Miranda* and *Griffin*.

All that remains then is to apply these principles to the facts at hand. First, it is without question that appellant voluntarily chose to testify; appellant has never alleged nor argued that he was in any way compelled to take the stand.

---

22. The *Grunewald* court reversed the trial court for abuse of discretion on the basis of its supervisory powers over the administration of criminal justice in the federal courts. Since the present case involves a ruling by a state court, even if we were presented with a *Grunewald*-type situation, it would not be immediately clear whether the question raised is appropriate for this court to resolve. *Cf.* Spencer v. Texas, 385 U.S. 554, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967).

23. 401 U.S. at 224, 91 S.Ct. at 645. Both *Raffel* and *Grunewald* impliedly recognized this distinction between allowing impeachment by prior silence while forbidding use of prior silence as evidence of guilt. Grune-

wald v. United States, 353 U.S. at 420–421, 420 n. 3, 77 S.Ct. 963; Raffel v. United States, 271 U.S. at 498, 46 S.Ct. 566.

24. Justice Black dissented separately without opinion.

25. 401 U.S. at 230, 91 S.Ct. at 648 (citations omitted).

26. *Miranda* stated that impeachment evidence is used "to demonstrate untruths in [defendant's statement] and thus to prove guilt by implication. These statements are incriminating in any meaningful sense of the word . . . ." 384 U.S. at 477, 86 S.Ct. at 1629.

Second, the impeachment evidence permitted in this case satisfies the *Harris* requirement of trustworthiness when that requirement is given its most sensible interpretation. Whether one chooses to view this requirement in terms of trustworthiness, inconsistency, reliability or probative value, *Raffel, Grunewald* and *Harris* have consistently considered it an evidentiary question. I think that under this precedent the impeachment evidence becomes constitutionally inadmissible only when it is so lacking in probative value that to permit its use would violate due process. I do not consider the present situation such a case. *See* Grunewald v. United States, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957); Raffel v. United States, 271 U.S. 494, 46 S.Ct. 566, 70 L.Ed. 1054 (1926); Griffin v. California, 380 U.S. 609, 617–623, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965) (Stewart, J., dissenting); Adamson v. California, 332 U.S. 46, 67 S.Ct. 1672, 91 L.Ed. 1903 (1947); Twining v. New Jersey, 211 U.S. 78, 29 S.Ct. 14, 53 L.Ed. 97 (1908); *cf.* Loper v. Beto, 405 U.S. 473, 485–494, 92 S.Ct. 1014, 31 L.Ed.2d 374 (1972) (Burger, C. J., dissenting); Spencer v. Texas, 385 U.S. 554, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967); Michelson v. United States, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948). Admittedly, evidence of prior *statements* may be more probative to show inconsistency than evidence of prior *silence*. This does not mean that prior silence is always without any probative value. *Gruenwald, supra.* As Justice Frankfurter noted in his concurring opinion in *Adamson*:

> "Sensible and just-minded men, in important affairs of life, deem it sig-

nificant that a man remains silent when confronted with serious and responsible evidence against himself which it is within his power to contradict. The notion that to allow jurors to do that which sensible and right minded men do every day violates the 'immutable principles of justice' as conceived by a civilized society is to trivialize the importance of 'due process.' "[27]

As a matter of due process these observations with regard to the weight, reliability, or probative value of silence as evidence have not been discredited by subsequent decisions of the Supreme Court. Even *Griffin* did not hold that evidence of silence was so lacking in probative value that its admission into evidence would have violated due process.[28] It merely held that regardless of its probative value, it may not be used as *evidence of guilt*.

In summary then, once it is determined that the defendant has freely taken the stand, *Harris* permits impeachment by probative evidence since it lends "valuable aid to the jury in assessing [a defendant's] credibility."[29] The scope of impeachment is not confined to collateral matters[30] but embraces all matters reasonably related to the subject of his direct testimony. Thus, *Harris* has affirmed the rule in *Raffel* that a defendant cannot partially waive his rights under the fifth amendment. As Chief Justice Burger has recently said, "the defendant waives the Fifth Amendment privilege as to any and all relevant matters when he decides to take the stand."[31]

Appellant nonetheless argues that the adoption of such a rule might "fetter"

27. Adamson v. California, 332 U.S. 46, 60, 67 S.Ct. 1672, 1680, 91 L.Ed. 1903 (1947).

28. *See* 380 U.S. at 619, 85 S.Ct. 1229 (Stewart, J., dissenting).

29. 401 U.S. at 225, 91 S.Ct. at 645.

30. *See* 401 U.S. at 227, 91 S.Ct. 643 (Brennan, J., dissenting); Walder v. United States, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954).

31. Brooks v. Tennessee, 406 U.S. 605, 616, 92 S.Ct. 1891, 1897, 32 L.Ed.2d 358 (1972) (Burger, C. J., dissenting). Chief Justice Burger referred to this rule for purposes of analogy only, as the petitioner in *Brooks* never took the stand in his own behalf. Consequently, the statement referred to in the text was not contradicted by the majority in *Brooks*. Indeed, the Chief Justice noted that the Supreme Court has never questioned such a rule.

the decision a defendant must make at time of arrest to such an extent that it would constitute an unconstitutional penalty. Specifically he suggests that a defendant "without legal counsel" and in the "pressure-packed atmosphere of an arrest" is forced to decide "whether or not he will want to testify in his own behalf at some vaguely defined trial that looms in the distant future."

In considering such a contention, one has no better benchmark from which to proceed than the following observation of Justice Harlan:

> "The criminal process, like the rest of the legal system, is replete with situations requiring 'the making of difficult judgments' as to which course to follow. McMann v. Richardson, 397 U.S. [759] at 769 [90 S.Ct. 1441, 25 L.Ed.2d 763] (1970). Although a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose. The threshold question is whether compelling the election impairs to an appreciable extent any of the policies behind the rights involved." [32]

Although I believe *Harris* has answered that "threshold question" in favor of subjecting a defendant who has freely taken the stand to any impeachment evidence of probative value, I will nonetheless assume *arguendo* that this threshold question must be considered anew in this situation.

Initially, it is quite clear that the requirements of *Miranda* were laid down precisely to counterbalance the "pressure-packed atmosphere" to which appellant refers.[33] Since appellant was

given his *Miranda* warnings but nonetheless chose not to seek counsel, his complaint in this respect is without merit.[34] Appellant's other concern cannot be as quickly dismissed. He suggests in effect that the policies behind the fifth amendment are impaired when a defendant at time of arrest must consider the possibility that he might testify at trial (with the consequence that he might have to explain to the jury his prior silence).

Supreme Court decisions subsequent to *Griffin* and *Miranda* have made it clear that not all "burdens" or "fetters" on a defendant's choice arise to the level of an unconstitutional penalty. Although resolving this issue is inevitably a matter of judgment to which fair-minded persons may differ, we are not without a guide to decision. Since *Griffin* probably the most extensive analysis on this subject of unconstitutional penalties on the exercise of the privilege appears in McGautha v. California, 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971). There the Supreme Court held that the constitution did not require the State of Ohio to have a bifurcated trial where guilt and punishment would be determined separately. The Court concluded that "the policies of the privilege against compelled self-incrimination are not offended when a defendant in a capital case yields to the pressure to testify on the issue of punishment at the risk of damaging his case on guilt." [35] Writing the majority opinion, Justice Harlan made these observations:

> "It is not contended, nor could it be successfully, that the mere force of evidence is compulsion of the sort forbidden by the privilege. . . .

32. McGautha v. California, 402 U.S. at 213, 91 S.Ct. at 1470.

33. *See* Miranda v. Arizona, 384 U.S. at 445 et seq., 86 S.Ct. 1602.

34. This Court has recently held that a defendant's sixth amendment rights are unconstitutionally penalized when a prosecutor comments during his summation to the jury that the defendant had consulted an attorney the day after the alleged crime was commit-

ted. United States ex rel. Macon v. Yeager, 476 F.2d 613 (3d Cir. 1973). Since we are not faced with the situation of prosecutorial comments on a defendant's silence *prior to obtaining counsel*, I would therefore leave open the possibility that comment on such silence would be an unconstitutional penalty because of the important sixth amendment rights involved.

35. 402 U.S. at 217, 91 S.Ct. at 1472.

*It does no violence to the privilege that a person's choice to testify in his own behalf may open the door to otherwise inadmissible evidence which is damaging to his case.*

\* \* \* \* \* \*

"It has long been held that a defendant who takes the stand in his own behalf cannot then claim the privilege against cross-examination on matters reasonably related to the subject matter of his direct examination. . . . It is not thought overly harsh in such situations to require that the determination whether to waive the privilege take into account the matters which may be brought out on cross-examination. It is also generally recognized that a defendant who takes the stand in his own behalf may be impeached by proof of prior convictions or the like. . . . Again, it is not thought inconsistent with the enlightened administration of criminal justice to require the defendant to weigh such pros and cons in deciding whether to testify.

"Further, a defendant whose motion for acquittal at the close of the Government's case is denied must decide whether to stand on his motion or put on a defense, with the risk that in so doing he will bolster the Government case enough for it to support a verdict of guilty. . . . Finally, only last Term in Williams v. Florida, 399 U.S. 78 [90 S.Ct. 1893, 26 L.Ed.2d 446] (1970), we had occasion to consider a Florida 'notice-of-alibi' rule which put the petitioner in that case to the choice of either abandoning his alibi defense or giving the State both an opportunity to prepare a rebuttal and leads from which to start. We rejected the contention that the rule unconstitutionally compelled the defendant to incriminate himself." [36]

Subsequent to *McGautha* the Supreme Court decided Brooks v. Tennessee, 406 U.S. 605, 92 S.Ct. 1891, 32 L.Ed.2d 358 (1972), wherein it was held impermissible for Tennessee to force a defendant, who desires to take the stand, to testify before any other testimony for the defense is heard. The majority in *Brooks*, however, did not place sole reliance on the fact that a difficult choice had been imposed on the defendant.[37] Crucial to the majority's decision was the heavy penalty imposed by the statute for remaining silent—complete foreclosure from testifying later.

*Brooks* is inapposite to our case for at least two reasons. First, the "penalty" imposed on appellant was much less severe than that imposed by the Tennessee statute in *Brooks*. Instead of losing his right to testify at a future time, appellant was merely subjected to the "traditional truth-testing devices of the adversary process."[38] Second, unlike *Brooks*, this lesser "penalty" was not a consequence of appellant's decision to remain silent; the penalty arose only because the defendant took the stand.

The choices and "burdens" confronting appellant were much more similar to those involved in *Raffel* wherein the Supreme Court rejected the argument that a defendant should be permitted to testify free of a requirement that he explain his silence at his first trial:

"The only suggested basis for such a qualifictaion is that the adoption of the rule contended for by the Government might operate to bring pressure on the accused to take the stand on the first trial, for fear of the consequences of his silence in the event of a second trial; and might influence the defendant to continue his silence on the second trial because his first silence may there be made to count against him. . . .

---

36. 402 U.S. at 213, 215–216, 91 S.Ct. at 1470 (citations omitted) (emphasis added).

37. Recognizing that making the choice to take the stand might in some cases be easier if made later, the dissent was unwilling to view this as a matter of constitutional dimensions. 406 U.S. at 613–617, 92 S.Ct. 1891 (Burger, C. J., dissenting, joined by Blackmun & Rehnquist, JJ.

38. Harris v. New York, 401 U.S. at 225, 91 S.Ct. at 645.

"But these refinements are without real substance. We need not close our eyes to the fact that every person accused of crime is under some pressure to testify, lest the jury, despite carefully framed instructions, draw an unfavorable inference from his silence. . . . Even if, on his first trial, he were to weigh the consequences of his failure to testify then, in the light of what might occur on a second trial, it would require delicate balances to enable him to say that the rule of partial immunity would make his burden less onerous than the rule that he may remain silent, or, at his option, testify fully, explaining his previous silence. We are unable to see that the rule that if he testifies, he must testify fully, adds in any substantial manner to the inescapable embarrassment which the accused must experience in determining whether he shall testify or not.

"The safeguards against self-incrimination are for the benefit of those who do not wish to become witnesses in their own behalf, and not for those who do. There is a sound policy in requiring the accused who offers himself as a witness to do so without reservation, as does any other witness." [39]

Finally, I note that this Court has already perceptively analyzed the "burden" imposed by the adoption of a complete waiver rule and rejected the contention that it amounts to an unconstitutional penalty under *Griffin:*

"Compulsion would have existed only if defendant realized that he might be asked at trial to explain his silence should his trial testimony prove inconsistent with silence while in incarceration. The coercive effect of such a realization, although perhaps real, is minimal. I do not find it substantial enough to raise the defendant's right against self-incrimination over the society's interest in using the methods of the adversarial process to discover truth. *Griffin* protected Burt from adverse comment if he refused to take the stand. Once he freely elected to testify, however, his testimony was uncoerced and society had a paramount stake in ascertaining the truth. In such a situation, the limitations of *Griffin* are inapplicable." [40]

I fully concur.

Thus, for each of the foregoing reasons I would uphold the constitutionality of the prosecutor's remarks in this case.[41]

## II

Appellant also contends that the search warrant was constitutionally in-

39. 271 U.S. at 498–499, 46 S.Ct. at 568.

40. *Burt, supra,* at 239 of 475 F.2d.

41. One might argue that in permitting impeachment by silence, this Court ought also to change the customary *Miranda* warnings. In a situation involving use of silence as evidence of guilt, this Court referred to a statement by the Sixth Circuit that the warning would have to be modified as follows: "If you say anything, that will be used against you; if you do not say anything, that will be used against you." United States ex rel. Smith v. Brierly, 384 F.2d 992, 994 (3d Cir. 1967) (held that use of silence as *evidence of guilt* was a denial of *due process,* in view of the unusual facts of the case), *quoting* McCarthy v. United States, 25 F.2d 298, 299 (6th Cir. 1928).

Not only do I believe such a warning is erroneous, but also I believe a modification of the *Miranda* warning would be unnecessary as well as undesirable. A defendant's si-

lence at time of arrest may *never* be used as evidence of guilt and may be used for impeachment only when he subsequently decides to take the stand. Thus, the customary warning that you have the *right to remain silent* and anything you say can be used against you does not misstate the law. A more complete statement of the law reflecting the contingent and collateral nature of the consequences of remaining silent undoubtedly could be formulated. Such a warning, however, defies simplicity and is likely to engender more ambiguity than clarity in the mind of a suspect. The possibility that a suspect's statement to police might arise from an act of resignation or misunderstanding caused by a confusing police warning is of greater consequence in my view than the possibility that a suspect might erroneously equate the "right to remain" silent with a right not to have his silence used against him for purposes of impeachment.

valid.[42] The state police officer who applied for and received the search warrant on November 30, 1967 for the Paddock Lounge and Restaurant submitted to the magistrate an affidavit, set forth in the margin,[43] which contained the following pertinent facts: 1) between the 18th and 20th of November, 1967, certain television sets were stolen from a Pennsylvania Railroad freight car; 2) a person arrested for receiving stolen property (one of the television sets stolen from the freight car) had told the affiant that he had obtained the television from appellant and another individual at a named gas station in Long Branch, New Jersey (which was a few blocks away from where the business establishment of appellant was located); [44] 3) appellant owned and operated the Paddock Lounge; and 4) the affiant therefore had good reason to believe and did believe that appellant was concealing the stolen property at the Paddock Lounge.

■ As to the information obtained from informant, appellant urges us to rule that it is unreliable under the *Aguilar-Spinelli* standard.[45] The information, however, consisted of declarations by the informant against his penal interest. The declarations not only directly implicated appellant but we believe a disinterested and prudent observer would have credited these statements as reliable. United States v. Harris, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971).

The central remaining issue before us then is whether there was probable cause to support the issuance of the search warrant. The state trial court in a pretrial suppression hearing held there was probable cause, reasoning as follows:

"There were two links established between the defendant and the premises searched: the informer's admission of his receipt of the television set from the defendant and the proximity of the [gas station] to the [business establishment]. It follows that defendant would have stolen property of the size and bulk of television sets in reasonably close proximity to a point of distribution of the stolen goods. Defendant's ownership [of a building] of sufficient size to hide large objects would tend to strengthen the suspicion that similar sets might be found at the suspect premises. There is no

---

42. The state magistrate who issued the search warrant for the Paddock Lounge issued a second search warrant. We agree with the district court that since no incriminating evidence was seized during the search of the second premises, the validity of that search warrant is not before us.

43. The affidavit in support of the search warrant stated *inter alia:*

"3. The facts tending for establishing the grounds for this application and probable cause of the deponents [police officer] belief that such grounds exist are as follows:

"A. Information was received by Detective Walter King of the New Jersey State Police, that the buildings known as the Paddock Lounge and Restaurant, 46 Chelsea Ave., Long Branch, N. J., are owned by Attilio Agnellino, of 48 Larchwood Ave., West Long Branch, N. J., and Lounge and Restaurant are operated by same.

"B. Information was received from a person arrested for Receiving Stolen Property (one of the stolen Silvertone color television sets) that he did receive from Atillio Agnellino and a person called 'Nunzio', stolen Silvertone color television sets, at the Morris Ave. Esso Station, located at Morris and Chelsea Aves., Long Branch, N. J.

"C. The stolen television sets were designated for shipment to various Sears Roebuck Stores in New Jersey and New York. The television sets are described as being Silvertone All Channel Color Television Sets, Model number 8181, console models, retail value $581.95 each, stolen during a breaking and entering and larceny of a Pennsylvania freight car # SSW 47143 at Pennsylvania Sub Station 40, Newark, N. J., sometime between 9:00 PM November 18, 1967 and 10:00 AM November 20, 1967."

44. The record is not clear as to the exact distance, but appellant asserts in his brief that the gas station was at least five blocks away from appellant's business establishment.

45. Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).

requirement that the issuing judge must be satisfied to a moral certainty that contraband can be found at a specific location." [46]

While we are in substantial agreement with the state court's analysis, we recognize that this case brings into sharp focus the narrow and admittedly difficult line which this court must draw in determining whether probable cause exists.

As noted by Chief Justice Burger in United States v. Harris, *supra*, the "issue in warrant proceedings is . . . [whether there is] probable cause for believing the occurrence of a crime *and the secreting of evidence in specific premises*." [47] While probable cause is an elusive concept, it clearly is something less than "certainty" or "evidence of guilt beyond a reasonable doubt," yet more than mere "suspicion." Stated differently, we think probable cause existed if the "facts and circumstances within [the affiant's] knowledge, and of which [he] has reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution to believe" that appellant possessed stolen television sets and that they were concealed in the Paddock Lounge. Carroll v. United States, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed.2d 543 (1925).

█ We stress, however, that we are not confronted with a faceless informant or with a police officer stating conclusions of probable cause without setting forth any underlying facts and circumstances from which those conclusions were drawn. We are thus not faced with the *Aguilar-Spinelli* problem. The question confronting us is whether accepting as reliable the underlying facts appearing in the affidavit, would a "man of reasonable caution" be warranted in believing that the appellant was concealing stolen television sets in the Paddock Lounge.

Since the television set the informant received from appellant was one of several which had been stolen from the freight car, we think a man of reasonable caution would believe that appellant was in possession of other stolen sets. And in view of the fact that one of the stolen sets had previously been transferred to the informant at a place within close proximity [48] to a business establishment which was owned and operated by appellant and was of sufficient size and character to conveniently conceal the televisions, we are unable to say that a man of reasonable caution would not believe that the televisions would be found on the premises. *See* United States v. Scolnick, 392 F.2d 320 (3d Cir.), cert. den. 392 U.S. 931, 88 S.Ct. 2283, 20 L.Ed.2d 1389 (1968); United States ex rel. Stoner v. Myers, 329 F.2d 280 (3d Cir. 1964); Weller v. Russell, 321 F.2d 848 (3d Cir. 1963); cf. Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949).

In finding probable cause, we are mindful that the Supreme Court has repeatedly concluded that decisions of probable cause made by a neutral and detached magistrate are entitled to greater weight than decisions of probable cause made by hurried police officers who have not sought prior judicial approval. United States v. Ventresca, 380 U.S. 102, 106, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); Jones v. United States, 362 U.S. 257, 270–271, 80 S.Ct. 725, 4 L.Ed.2d 697 (1959); United States v. Lefkowitz, 285 U.S. 452, 465, 52 S.Ct. 420, 76 L.Ed. 877

---

46. Opinion of Monmouth County Court, June 10, 1968. The court also referred to a second business establishment in close proximity to the gas station and for which a second search warrant was issued. The validity of this second warrant is not before this court. See note 42, supra.

47. 403 U.S. at 584, 91 S.Ct. at 2082 (emphasis added).

48. Although the distance between the Paddock Lounge and the gas station does not appear in the affidavit, the addresses of both were stated in the affidavit and it is reasonable to assume that a local magistrate would be familiar enough with the area to recognize the close proximity.

(1932). Such a rule not only encourages police officers to seek advance judicial approval of searches but also recognizes that the fourth amendment's commands are "practical and not abstract," requiring the testing and interpretation of affidavits by magistrates and courts alike in a "commonsense and realistic fashion." [49] *Ventresca, supra* at 108 of 380 U.S., 85 S.Ct. 741.

The order of the district court of October 16, 1972, will be affirmed.

SEITZ, Chief Judge (concurring).

■ I concur in Part II of Judge Hunter's opinion and in the result reached by him in Part I. I disagree, however, with his analysis in Part I. Were we faced here with a prosecutorial request that the jury infer guilt from the defendant's silence at the time of his arrest, after *Miranda* warnings were given, I could not agree with Judge Hunter that such comment was proper, even if only for impeachment purposes.

The *Burt* case, heavily relied on by Judge Hunter involved silence that was found to be essentially conduct, although, as with any evidence of conduct, its value as evidence lay in its implicit testimonial content. The defendant in *Burt* was charged with murder. He testified at trial that the shooting from which the charge arose had been accidental. This Court found proper the prosecutor's comment that Burt's trial testimony was inconsistent with his failure to notify anyone or to seek aid for the victim. The fact that among the people Burt failed to notify was a police officer, arresting Burt on another, unrelated charge, was

held not to make the prosecutor's remarks comment on Burt's silence "in the face of accusation"—Burt was not implicated in the shooting at the time of his silence, and his "non-action" rather than "non-speech" was the subject of comment. United States ex rel. Burt v. New Jersey, 475 F.2d 234, 236–237 (3d Cir. 1973).

Under Judge Hunter's view of the facts in this case, Agnellino's silence would be markedly different from Burt's. Agnellino's silence under Judge Hunter's conception would not be "non-action", *id.* at 236, that was inconsistent with trial testimony and that occurred at a time when the defendant did not stand accused of the crime with which we are concerned. Instead, Agnellino's silence would be the product of a conscious choice not to divulge information relevant to the crime with which we are concerned at the very time Agnellino was arrested and accused with commission of that crime. I do not believe that prosecutorial comment on such silence would be proper.

The Fifth and Fourteenth Amendments protect the individual from being compelled to bear witness against himself by a series of related prohibitions: if the defendant speaks as the result of actual coercion, his speech is excluded from evidence for all purposes; if he chooses not to speak, the prosecution cannot from that urge the jury to draw an inference of guilt; if he speaks without coercion but without knowledge of his rights, his speech is excluded from use as direct, but not impeachment, evidence. The last of these three protec-

---

**49.** Given the validity of the search warrant for television sets, whether there was probable cause to seize the carpet and air conditioners was not raised on this appeal or in the district court. While the record is not clear concerning the air conditioners, it does reveal that warehouse tags, perforated through the middle but with both halves intact, were attached to the seized carpet. Thus, even if the police were not aware at the time of the search that carpet of a similar nature had previously been stolen, the carpet reasonably could have been sus-

pected as contraband. *See, e. g.*, Marron v. United States, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927); Harris v. United States, 151 F.2d 837 (10th Cir. 1945), aff'd, 331 U. S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947); United States ex rel. DiRienzo v. Yeager, 443 F.2d 228, 231 (3d Cir. 1971). Moreover, since it does not appear that appellant raised this question in the state court proceedings, we would be without jurisdiction to entertain such a contention. 28 U.S.C. § 2254.

tions, embodied in the *Miranda* rule, differs in type from the first two.

The *Miranda* requirement of warnings is a prophylactic measure. It prohibits direct evidence use of statements made voluntarily by the defendant who was not advised of his rights of silence and of counsel, recognizing that such statements may be as reliable as direct testimony. The broad sweep of the *Miranda* rule guards against the possibility that an innocent defendant, in the face of police accusation and unaware of his rights, might make an honest and voluntary statement that is, nonetheless, subject to inculpatory construction. Cognizant, however, that the *Miranda* rule brings within its exclusionary sweep voluntary statements by guilty defendants, who may even be fully aware of their legal rights though police have not given the required warnings, courts have permitted impeachment use of voluntary statements made without *Miranda* warnings as an essential deterrent to intentional dishonesty by defendants. Such is the holding in *Harris*.

The protection against use of silence to infer guilt, like the protection against use of coerced statements, has not given rise to any prophylactic rule such as *Miranda* lays down. To say that a defendant's silence in the face of accusation can be used to impeach his testimony would have the same effect as allowing impeachment use of coerced confessions. The law has recognized that no testimonial statement may be drawn from silence in the face of police accusation, nor from a statement made under duress, that is sufficiently reliable to be admitted for any purpose in a criminal trial. There are, of course, peculiar circumstances such as found in *Burt* where we are concerned not with a defendant's failure to offer an exculpatory statement to rebut accusation but with his failure to act, to summon help in that case. But, as this Court approvingly noted and quoted in United States ex rel. Smith v. Brierly, 384 F.2d 992, 994 (3d Cir. 1967), "[l]acking such circumstances, to draw a derogatory inference from mere silence

is to compel respondent to testify; and the customary formula of warning should be changed, and the respondent should be told, 'If you say anything, it will be used against you; if you do not say anything, that will be used against you.' " McCarthy v. United States, 25 F.2d 298, 299 (6th Cir. 1928). I believe the admonition is as true regarding impeachment as where direct use is involved.

I do not, however, believe that "silence" by this defendant was the subject of the prosecutor's challenged remarks. The defendant, after being given the required warnings, answered all of the questions put to him by the police. According to the testimony of one police officer, defendant at the time of his arrest stated that he had gotten "a good buy" on the carpeting, that he paid about $150.00 for each air conditioner, and that in light of the price paid he would not be surprised if the air conditioners were stolen. At trial, the defendant testified that he had picked up the air conditioners for his business from one Bill Gordon, who did business at a specified location under the name "Metropolitan Air Conditioning", and that he paid $175.00 for each. His trial testimony essentially attempts to represent his purchase of these items as a "course of business" transaction. This picture differs markedly from the impression conveyed by the statements the police officer testified that defendant made the night of his arrest both in choice of words and in the details offered. The prosecutor's not unambiguous remarks appear to me to comment upon the differences in the statements made by defendant at trial and those made at the time of the arrest. Comment upon those differences, rather than upon defendant's silence, is permissible where credibility is in issue. For this reason, I concur in the result reached by Judge Hunter in Part I as well as in Part II of his opinion.

WEIS, Circuit Judge (concurring).

█ I concur in Part II of the Court's opinion and in the result reached in Part I.

I do not see this as a case where the prosecutor commented unfavorably upon the defendant's "silence." The district attorney's remarks were focused upon the issue of the defendant's credibility, and the comments on variations between the tenor of his statements at time of arrest and the testimony at trial were proper.

A defendant who chooses to answer questions with half truths cannot claim constitutional protection to remain silent as to the other half. A complete answer to a question may be as inconsistent with a partial reply as one completely different in detail. When Agnellino chose to respond to police interrogation, he effectively waived his right to remain silent, at the very least, to the topics covered by the questioning.

I think we need go no further in deciding this case.